IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|  |  |
|---|---|
| JANE DOE, | * |
| Plaintiff, | * |
| | * |
| v. | CIVIL NO.: WDQ-14-508 |
| | * |
| AE OUTFITTERS RETAIL CO., | * |
| Defendant. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

MEMORANDUM OPINION

Jane Doe[1] sued AE Outfitters Retail Co. ("AEO") for
negligence in the Circuit Court for Baltimore City.  ECF No. 2.
AEO removed the suit to this Court.  ECF No. 1.[2]  Pending are
AEO's motions to exclude Doe's expert testimony, ECF No. 33, and
for summary judgment, ECF No. 35.  Because these matters are
well-briefed and supported, no hearing is necessary.  *See United
States v. Davis*, 602 F. Supp. 2d 658, 663 (D. Md. 2009); Local
Rule 105.6 (D. Md. 2014).  For the following reasons, AEO's
motions will be granted in part and denied in part.

---

[1] The Court previously granted Doe's motion for leave to proceed
under a pseudonym.  ECF No. 13.

[2] This Court has diversity jurisdiction because the parties are
citizens of different states and the amount in controversy
exceeds $75,000.  *See* 28 U.S.C. § 1332(a)(1)(2012); ECF No. 1 ¶¶
2-4.

I.   Background

    A.   Facts[3]

    1.   Overview of the Parties and the Incident

    AEO owns American Eagle, a men's and women's clothing store
that largely caters to 18 to 25 year old customers.  ECF Nos.
35-2 at 4; 38-3 at 15.[4]  The York, Pennsylvania American Eagle
store is a "medium size store" located in the York Galleria
Mall.  ECF No. 35-5 at 3-4.  Doe lives in Baltimore County,
Maryland.  ECF No. 38-2 at 2.

    On October 22, 2012, Doe went to the York Galleria American
Eagle store (the "store") to shop for jeans.  ECF Nos. 35-3 at
3; 38-2 at 15.[5]  The unisex fitting rooms are located in the back
of the store, and are not visible from the front of the store.
ECF No. 38-3 at 4.  The fitting rooms had gaps above and below
the doors.  ECF No. 38-3 at 4 (verifying the accuracy of

---

[3] The facts relevant to the motion for summary judgment are from
exhibits attached to AEO's motion and Doe's opposition.  In
reviewing a motion for summary judgment, the nonmovant's
evidence "is to be believed, and all justifiable inferences are
to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477
U.S. 242, 255 (1986).  The facts relevant to the motion to
exclude expert testimony are summarized *infra* Section II.A.2.

[4] However, teenagers and customers in their 40s and 50s shop at
American Eagle.  ECF No. 35-5 at 4.  There are over 1,000
American Eagle stores in the United States.  ECF No. 35-2 at 4.

[5] According to Doe, the store "was very empty."  ECF No. 38-2 at
16.  Three AEO employees were on duty.  ECF No. 38-3 at 11.
However, Lindstrom "was the only employee [who] was working on
the sales floor."  *Id.* at 10.

photographs showing fitting room doors).[6]  AEO sales associate
Susan Lindstrom placed a male customer in a fitting room before
placing Doe in another fitting room; it was Doe's third visit to
the fitting rooms.  ECF Nos. 35-3 at 6; 38-2 at 23; 38-6 at 4.[7]
Lindstrom left the fitting rooms unattended to find Doe
additional sizes of jeans.  ECF No. 38-6 at 5.[8]

    Because she was not wearing underwear, Doe was naked from
the waist down while trying on the jeans.  ECF No. 35-3 at 4-6.
After pulling up a pair of jeans, she noticed a black iPhone

---

[6] AEO assistant manager Nicholas Lunz testified that the gaps
enabled sales associates to know when a customer was in a
fitting room because they could see shadows from the customer's
feet.  ECF No. 38-3 at 15.  AEO senior manager of store planning
Mathew Sabella testified that from 2000 to 2004, AEO typically
installed full-length doors; about 230 stores still have the
full-length door.  ECF No. 38-5 at 25-26.  In 2004, in response
to "feedback from store operations and directions from
leadership," AEO began installing three-quarter length doors.
Id. at 26.  The three-quarter length door allowed sales
associates to speak to customers "without actually barging in on
them," and to provide clothing without having to open the door.
Id.  Stores undergoing a "full remodel" receive the most recent
fitting room door design; stores undergoing refurbishment or
refreshment usually retain existing doors.  Id. at 27.

[7] According to Lindstrom and Lunz, there was nothing unusual
about the male customer, who had requested a fitting room "to
try some shirts on."  ECF Nos. 35-4 at 3; 35-5 at 5.  Lindstrom
placed him "way to the left of [the] fitting room[s]" and Doe
"way on the other side of the fitting room[s]."  ECF No. 38-6 at
5.

[8] Lindstrom was wearing a headset, which AEO sales associates use
to ask other employees to retrieve additional sizes.  ECF No.
38-6 at 55; see also ECF No. 35-5 at 3 ("If people needed sizes,
we would communicate over [the headsets].").

positioned under the fitting room door. *Id.* at 6; ECF No. 38-2 at 23. A male customer had placed the iPhone under the door and may have taken a picture or video of her. ECF No. 35-3 at 7; *see also* ECF No. 38-2 at 37. Doe screamed to alert the sales associates and ran after the man, who had fled the store. ECF No. 38-2 at 24-25. Lindstrom chased the man, but lost him. ECF No. 38-6 at 5. Lunz called the police, who arrived soon thereafter, but the man was never caught. ECF Nos. 38-3 at 12; 38-7 at 1-2; 38-8 at 1.[9]

    2.   AEO's Policies and Procedures

AEO has security policies and procedures to protect customers' privacy and safety in the event of an emergency. ECF No. 35-2 at 5-6. To protect customers' privacy, the fitting rooms "are in a segregated area" away from the sales floor, and the fitting room doors lock automatically. *Id.* An employee should monitor the fitting rooms "whenever possible," in part,

___

[9] Doe testified that the incident has caused her "anxiety and fear of this man coming to get me." ECF No. 38-2 at 31. She has "frequent[]" flashbacks, fear and anxiety when using public restrooms or fitting rooms, and fear that the alleged perpetrator will obtain her personal information from the police report. *Id.* Beyond her fear and anxiety, Doe has not suffered other injuries. *Id.* Doe has not sought medical treatment for her injuries, nor incurred medical bills. *Id.* In February 2013, Doe's attorney sent her for a psychiatric evaluation. *Id.* at 32. During her deposition, upon being presented with the psychiatrist's report, which she had previously read, Doe acknowledged that it contained the psychiatrist's recommendation that she receive psychotropic medication and psychotherapy. *Id.* at 34. However, Doe does not recall the psychiatrist recommending any treatment. *Id.*

so that customers would not have to leave the fitting room for additional sizes. *Id.* at 7; ECF Nos. 38-3 at 10; 38-5 at 3.

The store did not have security cameras or security guards. ECF No. 35-5 at 3. To protect customers, employees "were trained to talk to all the customers . . . and know who's in the store if something were to happen." *Id.* The store "[tried] to zone [the] employees so that [they] had views of every single area." *Id.* Employees "were assigned to check in on people in the fitting rooms." *Id.*

### 3.   Prior Similar Incidents

The store had not had prior similar incidents, and generally had a low level of crime. ECF Nos. 35-5 at 3-4; 35-6 at 3; 38-3 at 15; 38-9 at 4. However, three similar incidents had occurred at other American Eagle stores before October 22, 2012. ECF No. 38-9 at 4.[10]

### 4.   Industry Standards

According to Sabella, unisex fitting rooms "are standard in the industry." ECF No. 35-2 at 8. Segregated fitting rooms are disfavored because store personnel would have to monitor two

---

[10] In September 2011, an AEO employee allegedly photographed a customer in a fitting room in the McAllen, Texas American Eagle store. ECF No. 38-9 at 4. In January 2009, an AEO employee allegedly photographed a customer in the Pineville, North Carolina American Eagle store. *Id.* In July 2008, an AEO employee was allegedly photographed in a fitting room at the Langhorne, Pennsylvania American Eagle store. *Id.*

entrances, which is "more difficult." *Id.*; ECF No. 38-3 at 15.[11]
Sabella noted that the International Building Code, Americans
with Disabilities Act, and local regulatory codes are relevant
to fitting room design; however, he did not believe there were
"best practices" or official "industry standards" on fitting
room design.  ECF No. 38-5 at 27-28.

Doe's security expert Jack Dowling testified that he
"think[s]" the industry standard on fitting room location in
specialty retail stores is "where they can fit it in."  ECF No.
38-12 at 49.  Dowling does not know what the industry standard
is in connection with whether retail specialty stores have
associates monitor fitting rooms; however, one of AEO's
competitors, "Abercrombie and Fitch," requires a sales associate
"to remain permanently stationed in fitting rooms."  *Id.* at 50.

According to Dowling, "the standard *security practice* in
any industry," including the retail industry, "is to conduct a
security risk assessment and, based on that assessment, to
provide the necessary corrections or controls."  *Id.* (emphasis
added).  However, "there is no evidence that [AEO conducted a]
security risk assessment . . . to determine the obvious security
flaws with less than full-length doors."  ECF No. 38-10 at 3;
*see also id.* at 5.  An assessment would have disclosed that

---

[11] Lunz testified that although some stores have fitting room
doors that extend to the ground, others simply have a curtain
that may or may not extend to the ground.  ECF No. 38-3 at 15.

"realistic privacy" in unisex fitting rooms requires full-length doors, visibility from the main sales area, and dedicated monitoring. *Id.* at 4.

    b.   Procedural History

    On December 30, 2013, Doe sued AOE in the Circuit Court for Baltimore County for negligence. ECF No. 2.[12]  On February 20, 2014, AOE removed the suit to this Court. ECF No. 1.  On March 31, 2015, AOE moved to strike Doe's expert testimony, ECF No. 33, and for summary judgment, ECF No. 35. On April 23, 2015, Doe opposed the motions. ECF No. 38.  On May 7, 2015, AOE replied.

---

[12] Doe asserts the following claims under Pennsylvania law:
(1) Count one: "Negligent security";
(2) Count two: "Premises liability";
(3) Count three: "Negligent supervision"; and
(4) Count four: "Negligence."   ECF No. 2.

When sitting in diversity, a federal court follows the choice-of-law rules of the forum state. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941). Thus, Maryland choice-of-law rules govern.  In tort cases, Maryland applies the *lex loci delicti* rule. *Philip Morris, Inc. v. Angeletti*, 358 Md. 689, 744, 752 A.2d 200, 230 (2000).  Under that rule, "[the] substantive rights of the parties . . . are to be determined by the law of the state in which the alleged tort took place." *Id.* at 745, 752 A.2d 200 (citation omitted).  A tort occurs "where the injury was suffered, not where the wrongful act took place." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 511 (4th Cir. 1986).  Doe's alleged injuries occurred in York, Pennsylvania; thus, Pennsylvania law applies.

II.   Analysis

    A.   Expert Testimony

       1.   Rule 702 and *Daubert*

Under Rule 702, expert testimony is admissible if it will assist the trier of fact and is (1) "based upon sufficient facts or data," (2) "the product of reliable principles and methods," and (3) "the principles and methods [have been applied] reliably to the facts of the case." Fed. R. Evid. 702. As the *Daubert* Court has explained, evidence is admissible under Rule 702 if "it rests on a reliable foundation and is relevant." *Daubert*, 509 U.S. at 597; *see also Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L.Ed.2d 238 (1999) (extending *Daubert* to "the testimony of engineers and other experts who are not scientists"). The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence. *Id.* at 590.

As a threshold matter, the proffered expert must have "'some special skill, knowledge or experience,' concerning the particular issue before the court." *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 393 (D. Md. 2001) (*quoting Ancho v. Pentek Corp.*, 157 F.3d 512, 517 (7th Cir. 1998)). "[W]hile the fit between an expert's specialized knowledge and experience and the issues before the court need not be exact[,] . . . an expert's opinion is helpful to the trier of fact, and therefore

relevant under Rule 702, 'only to the extent the expert draws on
some special skill, knowledge or experience to formulate that
opinion.'"  *Id.* at 392-393 (*quoting Ancho,* 157 F.3d at 518).

Several factors may be relevant to the determination of
reliability, including: (1) whether a theory or technique has
been tested, (2) whether it has been subjected to peer review
and publication, (3) the known or potential rate of error, and
(4) whether the theory or technique is generally accepted within
a relevant scientific community.  *Copper v. Smith & Nephew,
Inc.,* 259 F.3d 194, 199 (4th Cir. 2001).  The factors are
"neither definitive nor exhaustive, and some may be more
pertinent than others depending on the nature of the issue, the
expert's particular expertise and the subject of his testimony."
*Newman v. Motorola, Inc.,* 218 F. Supp. 2d 769, 733 (D. Md.
2002).

    2.   AEO's Motion

AEO seeks to exclude Doe's technology expert Steven Stern,
Esq., and her security expert Jack Dowling.  ECF No. 33.

    a.   Steven Stern, Esq.

Doe seeks to have Stern testify as an expert on liability
and damages.  ECF No. 38 at 16.  On liability, Stern opines that
news stories about customers being filmed or observed in fitting
rooms, websites about "fitting room voyeurism," and the
availability of cellular phones capable of capturing and

9

disseminating images shows that the underlying incident was foreseeable.  ECF No. 38-11 at 2-3.  On damages, Stern opines that monitoring the Internet for Doe's image will be difficult and expensive, and "it is more than likely impossible" for Doe to remove any images from the Internet.  *Id.* at 3.

### i.  Liability

AEO argues that Stern is not qualified to render an opinion about the foreseeability of the underlying incident or about whether a cellular phone can fit under a fitting room door to capture an image.[13]  ECF No. 33-1 at 11, 16.  Doe argues that Stern's 25 years of information technology experience qualifies him to testify on the identified areas.  ECF No. 38 at 16-18.

Stern is a licensed attorney and President of Legal Technology Solutions, LLC.  ECF No. 38-11 at 4.  He has "substantial experience in solving complex technology issues," and often advises law firms on "Internet-related privacy issues."  *Id.* at 5.[14]  Most recently, he has consulted on cases

---

[13] AEO also argues that Stern's foreseeability opinion lacks a sufficient factual basis.  ECF No. 33-1 at 11-20.  Because the Court will find that Stern is not qualified to render an expert opinion on foreseeability, it need not address AEO's alternate argument.

[14] For example, he has experience developing direct deposit programs, communication systems, and "information management systems" such as email and document management servers.  ECF No. 38-11 at 19.  He also "oversees the development of Internet related tools," including email, social networking portals, case management systems, and complex database applications.  *Id.*

involving online postings of a pre- and post-surgery nude image
of a patient by a physician, and of "intimate moments" between a
man and a woman by someone who stole the woman's laptop. *Id*. at
5-6. However, his work has focused on identifying and removing
the images. *Id*. at 5. Stern's experience relevant to the
matters about which he would testify "comes from nearly [20]
years of experience and knowledge of Internet searching and
Internet reputation restoration work." *Id*. at 7. Stern has
testified once in court on "technology, electronic discovery,
and preservation issues." *Id*.[15]

Although "Rule 702 was intended to liberalize the
introduction of relevant expert evidence,"[16] courts must be
mindful of the tendency for expert testimony to "be both
powerful and quite misleading."[17] For that reason, as noted
above, to be helpful to the jury--and, thus, admissible--the
"expert [must] draw[] on [his] special skill, knowledge or
experience" when formulating his opinion. *Shreve*, 166 F. Supp.
2d at 393 ("[T]he opinion must be an expert opinion (that is, an
opinion informed by the witness'[s] expertise) *rather than*

---

[15] That case was styled *CVL v. Audio NOW*, Case No. 24-C12-003756,
in the Circuit Court for Baltimore City. ECF No. 38-11 at 7.

[16] *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir.
1999)(*citing Cavallo v. Star Enter.*, 100 F.3d 1150, 1158-59 (4th
Cir. 1996)).

[17] *Id*. (*quoting Daubert*, 509 U.S. at 596, 113 S. Ct. 2786).

*simply an opinion broached by a purported expert.")* (emphasis added).

The Court is unable to identify the "special skill" or "knowledge" underlying Stern's opinions because his technological expertise--including his work on identifying and removing Internet images--bears little relationship to the foreseeability of fitting room invasions of privacy. "The fact that a proposed witness is an expert in one area, does not *ipso facto* qualify him to testify as an expert in all related areas." *Id.* at 391. Stern's foreseeability opinions apparently stem from conducting a basic Internet search and "common knowledge." *See* ECF Nos. 38-11 at 7, 9-10; 38-16 at 23, 29, 32-34.[18] However, "one does not necessarily become an expert on a topic simply by testifying about it in court. . . . [A]n expert must have specific knowledge, not mere capacity to acquire knowledge." *Shreve*, 166 F. Supp. 2d at 394 (citation omitted);

---

[18] *See* ECF No. 38-16 at 29 ("It would be general knowledge that led me to be able to make a statement that says that cameras are highly available in portable devices. I mean, I think pretty much that would be common knowledge."). Stern's opinion that quickly capturing an image of Doe was made possible by the raised fitting room door is apparently based on the fact that "any user of a camera knows that the field of vision for mobile cameras is quite limited." ECF No. 38-11 at 9. When asked how high the fitting room door would need to be to prevent someone from holding a device underneath to capture an image, he used his own iPhone to demonstrate that it would need to be high enough to prevent someone from holding his camera lens at an angle. ECF No. 38-16 at 30. However, Stern is not an expert in fitting room design. *Id.* at 26-27.

*see also Smith v. Cent. Admixture Pharmacy Servs., Inc.*, No.
AW-07-3196, 2010 WL 1137507, at *3 (D. Md. Mar. 19, 2010) (more
than "general expertise" in a related area is required).
Additionally, proposed expert testimony on matters within the
jury's "common knowledge and experience . . . does not pass
muster." *Ruark v. BMW of N. Am., LLC*, No. ELH-09-2738, 2014 WL
351640, at *3 (D. Md. Jan. 30, 2014) (citations omitted).
Further, that Stern's opinion testimony embraces a legal
conclusion (foreseeability) lessens its helpfulness. *See United
States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002).   In sum,
Stern's liability opinion is not admissible as an "expert"
opinion.

ii.   Damages

AEO argues that Stern's damages opinion is irrelevant
because there is no evidence supporting that opinion.   ECF No.
33-1 at 20-21.   Doe argues that Stern's damages testimony is
relevant to whether her "fear that her naked images and/or
videos are present on the Internet" is "reasonable," and AEO
cannot "escape" its failure to designate a damages expert by
contending that Stern's testimony is irrelevant.   ECF No. 38 at
19-20.

According to Stern, Doe "will have to pay for years of
monitoring or risk that the images or her identity will become
linked to this incident."   ECF No. 38-11 at 15.   However, Stern

has neither met nor spoken to Doe, and does not know whether she
intends to monitor the Internet for her image.  ECF No. 38-16 at
35.  He does not know whether (1) Doe's image has been posted
online, (2) she has tried to identify her image online, or (3)
she has incurred any monitoring or removal costs.  *Id.* at 36.
Nonetheless, he opines that "to a reasonable degree of
professional certainty" Doe "will incur" costs of about "$12,000
per year to monitor and mitigate dissemination of images," and
about $15,000 in costs to forensically examine the alleged
perpetrator's "mobile device, home systems, and cloud accounts"
*if he is caught*.  ECF No. 38-11 at 15.

Although "mere weaknesses in the factual basis of an expert
witness'[s] opinion bear on the weight of the evidence rather
than on its admissibility,"[19] *some* factual basis for the opinion
is required.[20]  Stern has not stated any factual basis for his
opinions about the costs Doe "will incur."  *See* ECF No. 38-11 at
15.  Doe does not know whether the alleged perpetrator filmed or
photographed her, ECF No. 38-2 at 37, and there is no record

---

[19] *M-Edge Accessories LLC v. Amazon.com Inc.*, No. MJG-11-3332,
2015 WL 403164, at *16 (D. Md. Jan. 29, 2015), *appeal dismissed*
(June 11, 2015)(*quoting Basile Baumann Prost Cole & Assocs.,
Inc. v. BBP & Assocs. LLC,* No. WDQ-11-2478, 2012 WL 3115867, at
*4 (D. Md. July 25, 2012)).

[20] *McLean v. 988011 Ontario, Ltd.,* 224 F.3d 797, 801 (6th Cir.
2000) ("An expert's opinion, [when] based on assumed facts, must
find some support for those assumptions in the record."); *see
also Daubert,* 509 U.S. at 590 (an expert's opinion must be based
on "more than subjective belief or unsupported speculation").

evidence that she has monitored the Internet for her image or sought to remove it. An opinion is irrelevant when it assumes facts inconsistent with the record, because it lacks a "logical connection between the expert's theory and the facts of the case." *Boss v. Nissan N. Am., Inc.*, 228 F. App'x 331, 338 (4th Cir. 2007) (*citing Daubert*, 509 U.S. at 591). Further, under Pennsylvania law, "a jury may not award damages on the basis of speculation and conjecture." *Aircraft Guar. Corp. v. Strato-Lift, Inc.*, 991 F. Supp. 735, 739 (E.D. Pa. 1998)(*quoting Carroll v. Philadelphia Housing Authority*, 168 Pa. Comm. 275, 650 A.2d 1097, 1100 (1994)). Damages are speculative when--as here--"the uncertainty concerns the fact of damages" rather than the amount. *Id.; see also AMCO Ins. Co. v. Emery & Associates, Inc.*, 926 F. Supp. 2d 634, 647 (W.D. Pa. 2013). Accordingly, Stern's damages testimony is irrelevant, and, thus, inadmissible. *Daubert*, 509 U.S. at 591. AEO's motion will be granted as to Stern.[21]

---

[21] Doe has filed an affidavit under Fed. R. Civ. P. 56(d) signed by her attorney asking the Court to permit her to take the deposition of AEO's expert James McNamara before excluding Stern's testimony. *See* ECF No. 38-15. That affidavit states that Stern's testimony was designated, in part, to rebut McNamara's testimony on foreseeability. McNamara was named as an expert on October 9, 2014. ECF No. 30 at 1. Doe asked to depose McNamara on February 11, 2015, but due to counsel's conflicting schedules, the deposition did not occur. *Id.* Discovery in this case closed on February 25, 2015. *Id.* According to AEO, Doe has not tried to reschedule the deposition. ECF No. 39 at 2. Because Doe's affidavit provides

b.   Jack Dowling

Doe seeks to have Dowling testify about liability.  ECF
Nos. 38 at 9.  Dowling opines that the incident was foreseeable
because of (1) the "unmonitored, coed, and secluded" fitting
rooms, which lacked full-length doors; (2) the availability of
miniature cameras and camera phones; and (3) news reports about
similar and "other privacy and sex offense incidents" at
shopping malls and retail stores.  ECF No. 38-10 at 2.  Dowling
further opines that AEO's security was deficient because AEO had
failed to conduct a security assessment, which would have
revealed the need for full-length doors, greater visibility from
the sales area, and dedicated monitoring.  *Id*. at 3-5.

AEO argues that Dowling is not qualified to render an
opinion on retail fitting room security, his opinions lack a
sufficient factual basis, and they are unreliable.  ECF No. 33-1
at 17-27.  Doe argues that Dowling has "extensive experience" in
retail security, and his opinions are well-supported and
reliable.  ECF No. 38 at 9-15.

i.   Qualifications

Since 1998, Dowling has been President and Principal
Consultant for JD Security Consultants, LLC.  ECF No. 38-10 at
7.  He has about 30 years of experience in university campus

_____

no information that convinces the Court that Stern is qualified
to testify about foreseeability, or that his damages testimony
is relevant, the Court will not defer ruling on AEO's motion.

security, and has provided security advice to dozens of colleges, retail stores, medical facilities, hotels, restaurants, and other public and commercial entities. *Id.* at 7-8, 17-27.[22]  He has published 13 articles and one book chapter on security-related matters. *Id.* at 29-30.  Dowling has "served as a security expert witness in over 75 cases," including those involving retail premises liability. *Id.* at 7; *see also* ECF No. 38-12 at 9-10 (discussing Dowling's work as an expert in a case involving the sexual assault of a woman in a retail fitting room).  Since 1991 Dowling has been certified as a retail security "Protection Professional" by ASIS International.[23]  ECF No. 38-12 at 16.

AEO argues that Dowling is not qualified because "he has no specific experience with the fitting rooms in retail apparel stores," and "does not know what is standard in other retail stores." ECF No. 33-1 at 31.  The aforementioned summary of Dowling's qualifications shows that AEO's argument is wrong.

---

[22] Dowling was retained by a retail sports chain--"Philadelphia Runner"--to conduct a security assessment. ECF No. 38-12 at 23. Philadelphia Runner has unisex fitting rooms with full-length curtains, which are visible from the sales floor. *Id.* at 24.

[23] Founded in 1955, ASIS International is a "leading organization" dedicated to education, certification, and the development of security standards worldwide. *See* ASIS International, https://www.asisonline.org/About-ASIS/Pages/default.aspx (last visited Dec. 11, 2015).  Certification requires an initial examination and continuing education every three years.  ECF No. 38-12 at 16.

Further, not even AEO's senior manager of store planning is aware of an industry standard on fitting room design. *See* ECF No. 38-5 at 27-28.  Although Dowling may have more experience in campus--as opposed to retail--security, "the fit between an expert's specialized knowledge and experience and the issues before the court need not be exact." *Shreve*, 166 F. Supp. 2d at 393; *Smith*, 2010 WL 1137507, at *2.  Unlike Stern, Dowling's opinions are drawn from his "special skill, knowledge [and] experience" in security generally and in retail specifically, and he has frequently testified about similar matters before other courts.  Accordingly, Dowling is qualified to testify as an expert.

### ii.  Factual Basis

AEO faults Dowling for relying on news reports to opine that the incident was foreseeable.  ECF No. 33-1 at 21-26. However, Dowling also relied on discovery materials, AEO's policies and procedures, and site visits to three American Eagle stores, including the York Galleria store.  ECF No. 38-10 at 1-4.  The asserted flaws in Dowling's reliance on news reports are the proper subject of cross-examination. *See M-Edge Accessories LLC v. Amazon.com Inc.*, 2015 WL 403164, at *16;  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010)("[I]t is not the district court's role under Daubert to evaluate the correctness of facts underlying an expert's testimony.").

Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also Meterlogic Inc. v. KLT, Inc.*, 368 F.3d 1017, 1019 (8th Cir.2004) ("The district court must exclude expert testimony if it is so fundamentally unreliable that it can offer no assistance to the jury, otherwise, the factual basis of the testimony goes to the weight of the evidence."). The issues AEO raises about the news reports are straightforward; thus, with able cross-examination, a jury can determine whether the asserted deficiencies undermine Dowling's opinion.

### iii. Reliability

AEO argues that Dowling's opinions are unreliable because he failed to consider local crime statistics or obtain information from professional groups about fitting room invasions of privacy. ECF No. 33-1 at 26-28. Doe argues that local crime statistics are not necessarily relevant to foreseeability, and it is reasonable to expect some variation in methodology in each case. ECF No. 38 at 13-14.

Dowling testified that in forming his opinion about AEO's security adequacy, he relied, *inter alia*, on the 2003 ASIS International General Security Risk Assessment Guideline (the "ASIS Guide"), and the 2008 International Association of

19

Professional Security Consultants guideline on forensic best practices (the "IAPSC" Guide). ECF No. 38-12 at 6-7; *see also* ECF Nos. 38-13 (the ASIS Guide); 38-14 (the IAPSC Guide). The ASIS Guide notes that security practitioners *may* consider local crime statistics or information from professional groups and associations to determine risk at a given location; however, there are several other sources of useful information. ECF No. 38-13 at 2. To conduct a litigation-related security survey, the IAPSC Guide recommends (1) reviewing the incident report and related materials, the actions and qualifications of security personnel, and premises policies and procedures, and (2) conducting a site inspection. ECF No. 38-14 at 4-5. Dowling complied with those recommendations. *See* ECF No. 38-10 at 1-2, 3-4. Further, some variation in the "methodology to be used in a typical premises security case" is "reasonable." *Id.* at 2.[24]

---

[24] The IAPSC Guide recognizes three types of threats: actual, inherent, and potential. ECF No. 38-14 at 4. Potential threats inhere in security vulnerabilities. *Id.* Dowling characterized the possibility of fitting room invasions of privacy as potential threats that should have been discovered when the fitting rooms were designed. ECF No. 38-12 at 42. Actual threats are based on "[r]elevant crimes on the premises" or "in the immediate vicinity." ECF No. 38-14 at 4. Inherent threats "exist by virtue of the nature or characteristics of the business." *Id.* Industry trends may be more relevant to assessing potential threats than the store's history of criminal incidents; for example, the Virginia Tech massacre is relevant to security at all colleges and universities. *See* ECF No. 38-12 at 41.

Dowling's expert report and deposition testimony
demonstrate that his methodology is defensible, and his opinion
is the product of reliable principles and techniques.
Accordingly, AEO's motion will be denied as to Dowling.

    B.   Summary Judgment

      1.   Legal Standard

The Court "shall grant summary judgment if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R.
Civ. P. 56(a);[25] *Celotex Corp.*, 477 U.S. at 322. In considering
the motion, the judge's function is "not . . . to weigh the
evidence and determine the truth of the matter but to determine
whether there is a genuine issue for trial." *Anderson*, 477 U.S.
at 249. A dispute about a material fact is genuine "if the
evidence is such that a reasonable jury could return a verdict
for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most
favorable to . . . the nonmovant and draw all reasonable
inferences in her favor," *Dennis v. Columbia Colleton Med. Ctr.,
Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court must

---

[25] Federal Rule of Civil Procedure 56(a), which "carries forward
the summary-judgment standard expressed in former subdivision
(c)," changed "genuine 'issue' [to] genuine 'dispute,'" and
restored the word "'shall' . . . to express the direction to
grant summary judgment." Fed. R. Civ. P. 56 advisory
committee's note.

abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted).  The opposing party must produce evidence upon which a reasonable fact finder could rely. *Celotex Corp.*, 477 U.S. at 322-23.  The mere existence of a "scintilla" of evidence is insufficient to preclude summary judgment. *Anderson*, 477 U.S. at 252.

        2.    AEO's Motion

           a.    Counts One, Two, and Four

Counts one, two, and four allege--in essence--that AEO breached its duty to protect customers from harm. *See supra* note 26.  AEO argues that Doe has neither proffered evidence about industry practices with respect to fitting room "measures," nor shown that it failed to exercise reasonable care.  ECF No. 35-1 at 7-12.  AEO further argues that Doe has not shown that the underlying incident was foreseeable. *Id.* at 12-14.[26]  Doe argues that "to the extent industry standards are

---

[26] AEO also argues--without supporting authority--that counts one and two must be "stricken" because "negligent security" and "premises liability" are not distinct from Doe's "negligence" claim.  Count one alleges that AEO breached its "duty to protect business invitees from latent risks of harm of which it was on notice" by failing to have cameras, security guards, or "any security measures" to protect against the attack.  ECF No. 2 ¶¶ 23-24.  Count two alleges that AEO breached its duty to protect

relevant," there is a genuine factual dispute about what those standards are, and whether she has produced sufficient evidence of foreseeability is a question of fact for the jury. ECF No. 38 at 20-22.

To establish negligence under Pennsylvania law, a plaintiff must prove that: (1) "the defendant had a duty to conform to a certain standard of conduct"; (2) "the defendant breached that duty"; (3) "such breach caused the injury in question"; and (4) the plaintiff incurred "actual loss or damage." *Chapman v.*

---

against known or reasonably discoverable dangers by "taking no care" to prevent the attack. *Id.* ¶¶ 30-31. Count four alleges that AEO breached its "duty to exercise reasonable care to prevent foreseeable harm stemming from [its] conduct" by "failing to exercise due care in the design and security of its fitting room areas." *Id.* ¶¶ 44-45.

Although, as discussed *infra*, the underlying duty in all three claims is the same, the manner of AEO's alleged breach is somewhat different. More importantly, plaintiffs may plead alternative theories of liability. *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 189 (3d Cir. 1999) ("[P]laintiff may plead in the alternative, and our caselaw finds no difficulty with pairing the two claims in one complaint."); Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."). Thus, the Court will not strike counts one and two. The Court notes, however, that there can be only one recovery of damages for one wrong or injury, even when the plaintiff has presented more than one theory of recovery. *See In re Sibilia's Estate*, 279 Pa. 459, 460, 124 A. 137, 137 (1924); *Baltimore & Pittsburgh Motor Exp., Inc. v. Sustrick*, 286 F. Supp. 524, 528 (W.D. Pa. 1968).

AEO also argues--without supporting authority--that count three ("negligent supervision") must be "stricken" because the alleged crime was not committed by its employee. ECF No. 35-1 at 7. AEO raises the same argument as a basis for summary judgment, *id.* at 14-15; it will be addressed in that context. The Court will not strike count three.

*Chaon*, No. 14-4082, 2015 WL 4760515, at *2 (3d Cir. Aug. 13, 2015)(*quoting Phillips v. Cricket Lighters*, 576 Pa. 644, 841 A.2d 1000, 1008 (2003)).

"The standard of care a possessor of land owes to one who enters upon the land depends upon whether the person entering is a trespasser, licensee, or invitee." *Carrender v. Fitterer*, 503 Pa. 178, 469 A.2d 120, 123 (1983). One "who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land" is a "business invitee." *Palange v. City of Philadelphia Law Dept.*, 433 Pa. Super. 373, 640 A.2d 1305, 1308 (Pa. Super. Ct. 1994); *Vazquez v. Wal-Mart Stores, Inc.*, No. 09-2609, 2010 WL 3191852, at *3 n.7 (E.D. Pa. Aug. 5, 2010). The parties agree that Doe was a business invitee. *See* ECF Nos. 35-1 at 6-7; 38 at 20. The standard of care owed to a business invitee is "the highest duty owed to any entrant upon the land." *Vazquez*, 2010 WL 3191852, at *3 (*quoting Treadway v. Ebert Motor Co.*, 292 Pa. Super. 41, 436 A.2d 994, 998 (Pa. Super. Ct. 1981)). However, "[t]o render one liable for the deliberate criminal acts of unknown third persons can only be a judicial rule for given limited circumstances." *Feld v. Merriam*, 506 Pa. 383, 390, 485 A.2d 742, 745 (1984)

Pennsylvania has adopted § 344 of the Restatement (Second) of Torts as stating the law on a land possessor's duty to a

business invitee.  *See Moran v. Valley Forge Drive-In Theater,*

*Inc.*, 431 Pa. 432, 436, 246 A.2d 875, 878 (1968).  Under § 344,

> A possessor of land who holds it open to the public
> for entry for his business purposes is subject to
> liability to members of the public while they are upon
> the land for such a purpose, for physical harm caused
> by the accidental, negligent, or intentionally harmful
> acts of third persons or animals, and by the failure
> of the possessor to exercise reasonable care to
>
> (a) discover that such acts are being done or are
> likely to be done, or
>
> (b) give a warning adequate to enable the visitors to
> avoid the harm, or otherwise to protect them against
> it.

Restatement (Second) of Torts § 344 (1965); *Moran*, 431 Pa. at

436, 246 A.2d 875; *see also Murphy v. Penn Fruit Co.*, 274 Pa.

Super. 427, 431, 418 A.2d 480, 482 (1980).

Since *Moran*, Pennsylvania courts have interpreted § 344 as

requiring plaintiffs to establish three elements:

> First, that the plaintiff was injured by the kind of
> acts described in the section; second, that such acts
> were being done, or were likely to be done; and third,
> that the defendant failed in one of two duties-either
> to take reasonable care to discover that such acts
> were being done or were likely to be done, or to take
> reasonable care to provide appropriate precautions.

*Moultrey v. Great A & P Tea Co.*, 281 Pa. Super. 525, 534, 422

A.2d 593, 598 (1980); *Carswell v. Se. Pennsylvania Transp.*

*Auth.*, 259 Pa. Super. 167, 173, 393 A.2d 770, 773 (1978).

1.    Plaintiff Injured by the Kind of Acts
Described in § 344

Section 344 applies to "acts of third persons" resulting in "physical harm."  Restatement (Second) of Torts § 344.  The parties agree that Doe's injuries were allegedly caused by an unknown male perpetrator; *i.e.*, a "third person."  *See* ECF Nos. 35-3 at 6; 38-2 at 23.  However, neither party has addressed the requirement for "physical harm."  Doe testified that the incident has caused her "anxiety and fear," including "flashbacks."  ECF No. 38-2 at 31-32.  Thus, the Court must first decide whether Doe has proffered sufficient evidence of the type of injury for which a possessor may be held liable under § 344.[27]

Cases involving § 344 liability typically involve bodily injuries.  *See, e.g.*, *Moran*, 431 Pa. at 434, 246 A.2d 875 (loss of hearing); *Moultrey*, 281 Pa. Super. at 527, 422 A.2d 593 (slip and fall); *Murphy*, 274 Pa. Super. at 430, 418 A.2d 480 (stabbing); *Vazquez*, 2010 WL 3191852, at *1 (slip and fall); *Danielle Salamone v. The Catholic Archdiocese of Philadelphia & Brian Cohen*, No. NO. 1566., 1995 WL 1316037 (Pa. Com. Pl. Nov.

---

[27] *See Bouchat*, 346 F.3d at 526 (discussing Court's obligation "to prevent factually unsupported claims . . . from proceeding to trial"); *see Kannady v. City of Kiowa*, 590 F.3d 1161, 1170 (10th Cir. 2010) (*citing Celotex Corp.* for the proposition that district courts may consider grounds not raised in a summary judgment motion).

29, 1995)(rape).[28]  In *Paliometros v. Loyola*, 2007 Pa. Super.
242, ¶ 21, 932 A.2d 128, 134 (2007), the Pennsylvania Superior
Court affirmed a verdict under § 344 for a plaintiff who had
been raped at a fraternity party.  However, the Court noted that
the plaintiff had suffered an additional "physical injury" or
"physical manifestation of [her] injury" in the form of post-
traumatic stress disorder.  *Id.* ¶ 26, 932 A.2d 128.  The Court
defined post-traumatic stress disorder as an "emotional
condition" that may cause "nightmares, obsessive thoughts, . . .
flashbacks," and the avoidance of situations or people.  *See id.*
¶ 27, 932 A.2d 128.  Although there is no evidence that Doe was
bodily assaulted, viewing the evidence in the light most
favorable to Doe and drawing all reasonable inferences in her
favor,[29] *Paliometros* leaves open the possibility that Doe's
injuries count as "physical harm" under § 344.[30]  Accordingly, a

---

[28] *See also Barnett v. YMCA of Delaware Cent. Branch Member, LLC*,
No. 06C-02-019JOH, 2006 WL 1303240, at *2 (Del. Super. May 10,
2006) (noting that "fear of exposure" to disease from being
splashed with urine "would result in dismissal" of a negligence
claim under § 344; however, the plaintiff's claim survived
because he had alleged physical injuries from preventive
medication).

[29] *See Dennis*, 290 F.3d at 645.

[30] This finding is reinforced by Pennsylvania law on negligent
infliction of emotional distress ("NIED"), which--like § 344
liability--requires a showing of "physical injury or harm."
*Wall by Lalli v. Fisher*, 388 Pa. Super. 305, 313, 565 A.2d 498,
502 (1989).  In *Love v. Cramer*, 414 Pa. Super. 231, 238-39, 606
A.2d 1175, 1179 (1992), the Pennsylvania Superior Court

reasonable jury could find that Doe was injured by the kind of acts described in § 344.

                2.    Acts Were Being Done or Likely to Be Done

The second element involves the foreseeability of third party conduct. Because "the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur." *Moran*, 431 Pa. at 436, 246 A.2d 875 (*quoting* Restatement (Second) of Torts § 344 cmt. f). Such knowledge may arise from the possessor's "past experience" or the "place or character of [the] business." *Id.* at 436-37 (liability was a question of fact for the jury when evidence demonstrated that the defendants had notice of prior firecracker explosions at a drive-in theater); *Vazquez*, 2010 WL 3191852, at *3.

AEO argues that the incident was not foreseeable because the type of crime allegedly committed had never happened at the York, Galleria American Eagle store. ECF No. 35-1 at 12-13.

---

sustained a NIED claim when the plaintiff alleged "physical manifestations of emotional suffering," including "depression, nightmares, stress, and anxiety." Although the plaintiff's "injuries were of a continuous nature," and--unlike Doe's injuries--required psychological treatment, those are matters of degree--not kind. *See id.* (noting that the plaintiff's injuries were not "transitory" or "nonrecurring" and, thus, sufficiently serious). Crucial to this Court's inquiry is the Pennsylvania Superior Court's willingness to consider mental and emotional conditions as physical harm.

Doe argues that prior instances at other American Eagle stores count as AEO's "past experience" from which this incident was foreseeable.  ECF No. 38 at 21-22.[31]

Although courts have typically found acts of third parties foreseeable when past incidents have occurred on the same premises,[32] the plain language of § 344 does not require the Court to limit the foreseeability inquiry to the extent AEO suggests.  Comment (f)[33] merely requires that the possessor "know[] or [have] reason to know" about the likelihood of third

---

[31] Doe further argues--without supporting authority--that because AEO targets "teens and young adults, the 'nature' of its business renders it a target for sexual predators seeking to invade the privacy of AEO's customers."  ECF No. 38 at 22.  AEO counters that the "nature of [its] business is the sale of clothing," about which "there is nothing dangerous or unusual" that would make the underlying incident foreseeable.  ECF No. 39 at 9.  AEO is correct.  In examining the "place or character" of the business, courts consider whether the "defendant's business is such that it is an *inherently dangerous place*."  *Vazquez*, 2010 WL 3191852, at *3 (emphasis added).  There is nothing "inherently dangerous" about the sale of clothing.  *Cf. Glass v. Freeman*, 430 Pa. 21, 240 A.2d 825, 830 (1968) (noting the dangerous character of construction sites).

[32] *See, e.g.*, *Moran*, 431 Pa. at 435, 246 A.2d 875 (defendant's notice of prior acts "within their premises" establishes jury question on liability; record revealed several firecracker explosions at the defendant's drive-in theater in the past two years); *Vazquez*, 2010 WL 3191852, at *4 (past experience means previous occurrences "at that business"; summary judgment inappropriate when the defendant had notice of a "slip and fall *in that area*").

[33] "Restatement (Second) of Torts, §344 and its comment (f) have long been the law of Pennsylvania."  *Vazquez*, 2010 WL 3191852, at *3 (*quoting Eileen A. Donovan & Daniel J. Donovan v. Strawbridge & Clothier (Clover Div.)*, No. 2985., 1994 WL 1251144 (Pa. Com. Pl. June 24, 1994)).

party conduct.  Restatement (Second) of Torts § 344 cmt. f.

Taking AEO's argument to its logical extreme, if similar

incidents had routinely occurred at every store but the York,

Galleria store, the Court would not be justified in finding that

AEO should have foreseen this first instance at the York,

Galleria store.  The Court is not convinced.  As the

Pennsylvania Supreme Court has recognized,

> places to which the general public are invited might
> indeed anticipate, *either from common experience or
> known fact*, that places of general public resort are
> also places where what men can do, they might. One who
> invites all may reasonably expect that all might not
> behave, and bears responsibility for injury that
> follows the absence of reasonable precaution against
> that common expectation.

*Feld*, 506 Pa. at 391, 485 A.2d 742 (emphasis added).  When--as

here--the defendant owns a chain of over 1,000 stores, many of

which have identical fitting room design,[34] a reasonable jury

could infer that the underlying incident was foreseeable because

similar incidents had occurred at other American Eagle

locations.[35]  *See Huddleston v. Infertility Ctr. of Am., Inc.*,

700 A.2d 453, 460 (Pa. Super. Ct. 1997) ("In all but the

clearest of cases, [the] foreseeability determination is one for

the jury.").

---

[34] *See* ECF Nos. 35-2 at 4; 38-5 at 25-27.

[35] *See* ECF No. 38-9 at 4.

iii. Defendant Failed in One of Two Duties

As noted above, the third element requires Doe to show that AEO failed "either to take reasonable care to discover that such acts were being done or were likely to be done, or to take reasonable care to provide appropriate precautions." *Moultrey*, 281 Pa. Super. at 534, 422 A.2d 593 ("[T]the invitee must prove either that the proprietor had a hand in creating the harmful condition, or that he had actual or constructive notice of such condition."). AEO argues that Doe has failed to establish the industry standard with respect to fitting rooms and therefore cannot establish what is reasonable. ECF No. 35-1 at 14. However, Sabella--AEO's senior manager of store planning--does not believe there is an industry standard. *See* ECF No. 38-5 at 27-28. AEO has not provided--nor has the Court found--authority for the proposition that reasonableness *must* be established by reference to an "industry standard." Whether AEO acted reasonably is generally "a question of fact for the [j]ury." *Moran*, 431 Pa. at 437, 246 A.2d 875.

Here, the record evidence shows diverse fitting room designs and locations. *See* ECF Nos. 38-3 at 15; 38-5 at 25-27; 38-12 at 49. At least one store requires a sales associate to remain in the fitting room at all times. *See* ECF No. 38-12 at 50. Doe has proffered evidence that AEO should have conducted a security risk assessment, but failed to. *See* ECF Nos. 38-10 at

3-5; 38-12 at 50.  Doe contends that assessment would have
revealed changes to fitting room design, location, and
monitoring necessary to ensure customer privacy and safety, and
would have made AEO aware of prior similar incidents in other
stores.  *See* ECF Nos. 38-9 at 4; 38-10 at 3-5; 38-12 at 50.
Thus, a reasonable jury could find that AEO had actual or
constructive notice of the danger that the incident at issue
could occur, or that AEO had failed to act reasonably to prevent
it.  *See Bonilla v. Motel 6 Operating L.P.*, No. 2:09CV712, 2011
WL 4345786, at *5 (W.D. Pa. Sept. 15, 2011) ("The issue of
whether a defendant breached any duty may be removed from the
jury only 'when the case is free from doubt and there is no
possibility that a reasonable jury could find negligence.'")
(*quoting Emerich v. Philadelphia Center for Human Development,
Inc.*, 554 Pa. 209, 720 A.2d 1032, 1044 (1998)).  Accordingly,
AEO is not entitled to summary judgment on counts one, two, and
four.

       b.   Count Three

    Count three alleges that AEO breached its duty to
reasonably supervise its employees.  AEO argues that summary
judgment is merited because the alleged crime was not committed
by one of its employees.  ECF No. 35-1 at 14-16.  Doe argues
that Lindstrom's act of leaving the fitting rooms unattended

raises a factual issue about whether AEO negligently failed to train or supervise its employees.  ECF No. 38 at 23.

"Negligent supervision requires the four elements of common law negligence, *i.e.*, duty, breach, causation, and damages." *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 488-89 (3d Cir. 2013) (*citing Brezenski v. World Truck Transfer, Inc.*, 755 A.2d 36, 42 (Pa. Super. Ct. 2000)).  The theory of negligent supervision espoused by AEO requires Doe to prove that it failed "to exercise ordinary care to prevent an intentional harm by an employee acting outside the scope of his employment." *See id.* at 487-88 (*citing Dempsey v. Walso Bureau, Inc.*, 431 Pa. 562, 246 A.2d 418, 420 (1968)); *see also* Restatement (Second) of Torts § 317 (1965).

However, Pennsylvania courts have adopted the Restatement (Second) of Agency § 213 (1958) as an alternate theory of liability for negligent supervision.  *See Bayview Loan Servicing, LLC v. Law Firm Of Richard M. Squire & Associates, LLC*, No. CIV.A.10-1451, 2010 WL 5122003, at *5 (E.D. Pa. Dec. 14, 2010) (*citing Heller v. Patwil Homes Inc.*, 713 A.2d 105, 107-09 (Pa. Super. Ct. 1998)).  Under § 213, an employer "conducting an activity through servants or other agents" may be liable for negligent "supervision of the activity" when employees are acting *within* the scope of their employment. Restatement (Second) of Agency § 213(c); *see also Doe v.*

*Liberatore*, 478 F. Supp. 2d 742, 760 (M.D. Pa. 2007); *Bayview Loan Servicing, LLC*, 2010 WL 5122003, at *6.

To be held liable, "the employer must have known or, in the exercise of appropriate care, should have known that an employee had a propensity to engage in conduct for which the employee could be held liable." *McClain v. Citizen's Bank, N.A.*, 57 F. Supp. 3d 438, 442 (E.D. Pa. 2014) (*citing Keffer v. Bob Nolan's Auto Service, Inc.*, 59 A.3d 621, 662 (Pa. Super. Ct. 2012)).

To support her contention that AEO negligently failed to train or supervise its employees, Doe relies on evidence that-- contrary to AEO's policy requiring sales associates to monitor the fitting rooms "whenever possible"--Lindstrom left the fitting rooms unattended to find Doe additional sizes of jeans when she could have asked another employee for assistance. *See* ECF No. 38 at 23; *see also* ECF Nos. 35-2 at 7; 35-5 at 3; 38-6 at 5, 55. However, there is no record evidence that AEO knew, or should have known, about the propensity for such conduct. *See Keffer*, 59 A.3d at 662 (granting summary judgment for employer when the plaintiff presented no evidence about employee's prior conduct); *Heller*, 713 A.2d at 109 (finding employer liable for negligent supervision when the plaintiff established that--for "two months and in plain view of anyone interested enough to engage in a modicum of managerial supervision"--employee had unlawfully "fleec[ed]" the

defendants' clients).  Accordingly, AEO is entitled to summary

judgment on count three.[36]

III. Conclusion

    For the reasons stated above, AEO's motions to exclude

expert testimony and for summary judgment will be granted in

part and denied in part.


_12/17/15_____

Date

_____

William D. Quarles, Jr.
United States District Judge


---

[36] Doe's Rule 56(d) affidavit also asks the Court to permit her
to take the deposition of AEO's expert James McNamara before
entering summary judgment.  *See* ECF No. 38-15.  Rule 56(d)
requires the Court to refuse summary judgment when the nonmovant
"has not had the opportunity to discover information that is
essential to [their] opposition."  *Works v. Colvin*, 519 F. App'x
176, 181–82 (4th Cir. 2013) (*quoting* Fed. R. Civ. P. 56(d))
(internal quotation marks omitted).  However, a Rule 56(d)
request for discovery is properly denied when the discovery
sought would not create a genuine issue of material fact
sufficient to defeat summary judgment.  *See Strag v. Bd. Of
Trustees, Craven Cmty. College*, 55 F.3d 943, 954 (4th Cir.
1995).  Here, the affidavit states that McNamara's deposition is
necessary "in the context of the challenges [AEO] makes to
[Doe's] experts and on the question of foreseeability [of the
underlying incident]."  ECF No. 38-15 ¶ 7.  The affidavit does
not state that Doe seeks evidence about Lindstrom's prior
conduct sufficient to create a genuine dispute of material fact
about an essential element of her negligent supervision claim.
Accordingly, Doe's Rule 56(d) affidavit does not bar this Court
from entering judgment on count three.